**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **DANIEL BENJAMIN GILBERT,**<br><br>Plaintiff,<br><br>v.<br><br>**ANTHROPIC PBC,**<br><br>Defendant. | Case No. 3:26-cv-30081-MGM |

# ANTHROPIC PBC'S AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND DECLARATORY JUDGMENT OF NON-INFRINGEMENT COUNTERCLAIM TO PLAINTIFF'S FIRST AMENDED COMPLAINT

Defendant Anthropic PBC ("Anthropic"), by and through the undersigned attorneys, hereby responds to the First Amended Complaint with the following Answer, Affirmative Defenses, and Declaratory Judgment Counterclaim.

## ANSWER

Unless specifically admitted below or in the allegations in Anthropic's Counterclaim, Anthropic denies each and every allegation in the First Amended Complaint. To the extent the headings of the First Amended Complaint are construed as allegations, they are denied and are provided for convenience only.

## NATURE OF THE ACTION

1. Anthropic admits that Plaintiff has asserted a claim for copyright infringement relating to the book *Hacking World of Warcraft* (the "Work") but denies the remaining allegations in Paragraph 1.

## PARTIES

2. Anthropic is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2 and, on that basis, denies the allegations.

3. Paragraph 3 states a legal conclusion to which no response is required. To the extent a response is deemed required, Anthropic is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3 and thus denies the allegations.

4. Admitted.

## JURISDICTION AND VENUE

5. Admitted.

6. For the purpose of this action only, and without waiving any rights to object to, or otherwise challenge, personal jurisdiction in other actions, Anthropic responds that it does not contest personal jurisdiction over it for this action only.

7. Anthropic admits that it offers subscription-based products and services that are available to customers, including customers located in Massachusetts, and that it derives revenue from some of its customers. Anthropic denies the remaining allegations in Paragraph 7.

8. Paragraph 8 states a legal conclusion to which no response is required. To the extent a response is deemed required, Anthropic denies the allegations in Paragraph 8.

9. Denied.

10. Anthropic admits that it offers subscription-based products and services related to its Claude models that are available to customers, including customers located in Massachusetts, and that it derives revenue from some of its customers. Anthropic denies the remaining allegations in Paragraph 10.

11. Anthropic admits that Claude was first publicly released in March 2023 and that Anthropic offers subscription-based products and services related to its Claude models that are available to customers, including customers located in Massachusetts, and that it derives revenue from some of its customers. Anthropic denies the remaining allegations in Paragraph 11 and incorporates by reference its responses to the allegations contained in Paragraphs 59 and 62.

12. Anthropic admits that Plaintiff purports to assert a claim for copyright infringement relating to the book *Hacking World of Warcraft* but denies the remaining allegations in Paragraph 12.

13. Denied.

14. Anthropic admits that it offers subscription-based products and services that are available to customers, including customers located in Massachusetts, and that it derives revenue from some of its customers. Anthropic denies the remaining allegations in Paragraph 14.

15. Paragraph 15 states a legal conclusion to which no response is required. To the extent a response is deemed required, Anthropic does not contest personal jurisdiction for this action only and denies the remaining allegations in Paragraph 15.

16. To the extent the allegations in Paragraph 16 purport to summarize or characterize the contents of the Massachusetts Secretary of the Commonwealth, Corporations Division, Business Entity Summary for Anthropic PBC (archived at https://perma.cc/Z8VU-R8EA), this record speaks for itself and is public information which requires no admission or denial. Consistent with Anthropic's responses to Paragraphs 6–15, Anthropic does not contest personal jurisdiction in this action only and denies the remaining allegations in Paragraph 16.

17. For the purpose of this action only, and without waiving any rights to object to, or otherwise challenge, venue in other actions, admitted for this action only. Anthropic denies the remaining allegations set forth in Paragraph 17.

**FACTUAL ALLEGATIONS**

18. Anthropic is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18 and, on that basis, denies the allegations.

19. Anthropic is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19 and, on that basis, denies the allegations.

20. Paragraph 20 states a legal conclusion to which no response is required. To the

extent a response is deemed required, Anthropic denies the allegations in Paragraph 20.

21. To the extent the allegations set forth in Paragraph 21 purport to summarize or characterize the contents of Exhibit A, the exhibit speaks for itself. The content of the copyright registration is public information which requires no admission or denial. To the extent a response is deemed required, admitted that a copyright registration in Exhibit A ("Copyright Registration Certificate") purports to cover the Work, bears Registration No. TX 7-204-548, and lists the July 7, 2008 registration date.

22. To the extent the allegations set forth in Paragraph 22 purport to summarize or characterize the contents of Exhibit A, the exhibit speaks for itself. The content of the copyright registration is public information which requires no admission or denial. To the extent a response is deemed required, admitted that the copyright registration in Exhibit A lists Daniel Gilbert and James Whitehead II as authors and Wiley Publishing, Inc. as the copyright claimant by written agreement.

23. Anthropic is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23 and, on that basis, denies the allegations.

24. Anthropic admits Exhibit B ("Publishing Agreement (Redacted)") appears to be the Publishing Agreement between Plaintiff and Wiley Publishing, Inc. with respect to *Hacking World of Warcraft*, dated July 20, 2006. To the extent the allegations set forth in Paragraph 24 purport to summarize or characterize the contents of Exhibit B, the exhibit speaks for itself and requires no admission or denial. To the extent a response is deemed required, Anthropic lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 24 and therefore denies them.

25. Anthropic admits Exhibit C ("January 29, 2007 Amendment to the Publishing Agreement (Redacted)") appears to be an Amendment to the Publishing Agreement between Plaintiff and Wiley Publishing, Inc. with respect to *Hacking World of Warcraft*. To the extent the

allegations set forth in Paragraph 25 purport to summarize or characterize the contents of Exhibit C, the exhibit speaks for itself and requires no admission or denial. To the extent a response is deemed required, Anthropic lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 25 and therefore denies them.

26. Anthropic admits Exhibit D ("May 29, 2007 Amendment to the Publishing Agreement") appears to be an Amendment to the Publishing Agreement between Plaintiff and Wiley Publishing, Inc. with respect to *Hacking World of Warcraft*, dated May 29, 2007. To the extent the allegations set forth in Paragraph 26 purport to summarize or characterize the contents of Exhibit D, the exhibit speaks for itself and requires no admission or denial. To the extent a response is deemed required, Anthropic lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 26 and therefore denies them.

27. Anthropic is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27 and, on that basis, denies the allegations.

28. Paragraph 28 states a legal conclusion to which no response is required. To the extent a response is deemed required, Anthropic lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 28 and therefore denies them.

29. Paragraph 29 states a legal conclusion to which no response is required. To the extent a response is deemed required, Anthropic denies the allegations in Paragraph 29.

30. Denied.

31. To the extent the allegations set forth in Paragraph 31 purport to summarize or characterize the contents of Exhibits B, the exhibit speaks for itself and requires no admission or denial. Anthropic denies the remaining allegations in Paragraph 31.

32. Anthropic admits that the language at paragraph 16 of Exhibit B is quoted in Paragraph 32. To the extent Paragraph 32 states a legal conclusion, no response is required. Anthropic is otherwise without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 32 and, on that basis, denies the allegations.

33. Anthropic admits Exhibit E ("Plaintiff's Notice of Infringement to Wiley and Proof of Receipt") appears to be a letter from Plaintiff to John Wiley & Sons, Inc. and a U.S. Postal Service Certified Mail Receipt, both dated January 9, 2026. To the extent the allegations set forth in Paragraph 33 purport to summarize or characterize the contents of Exhibit E, the exhibit speaks for itself and requires no admission or denial. To the extent a response is deemed required, Anthropic lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 33 and therefore denies them.

34. To the extent the allegations set forth in Paragraph 34 purport to summarize or characterize the contents of Exhibits B and E, the exhibits speak for themselves and require no admission or denial. Anthropic is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34 and, on that basis, denies the allegations.

35. Anthropic admits Exhibit F ("Communication from Wiley's Legal Counsel") appears to be an email from James Minatel, Associate Publisher at John Wiley & Sons, Inc., to Plaintiff, dated June 23, 2026. To the extent the allegations set forth in Paragraph 35 purport to summarize or characterize the contents of Exhibit F, the exhibit speaks for itself and requires no admission or denial. The remaining allegations are comprised of legal conclusions to which no response is required. To the extent a response is deemed required, Anthropic lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 35 and therefore denies them.

36. Anthropic admits Exhibit G ("Plaintiff's Notice of This Action to Wiley and Proof of Receipt") appears to be a letter from Plaintiff to John Wiley & Sons, Inc., a U.S. Postal Service Certified Mail Receipt, and an email from Plaintiff to James Minatel at Wiley, all dated June 23, 2026. To the extent the allegations set forth in Paragraph 36 purport to summarize or characterize the contents of Exhibit G, the exhibit speaks for itself and requires no admission or denial. Anthropic is otherwise without knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 36 and, on that basis, denies the allegations.

37. To the extent the allegations set forth in Paragraph 37 purport to summarize or characterize the contents of Exhibits B–G, the exhibits speak for themselves and require no admission or denial. The allegations also contain legal conclusions to which no response is required. To the extent a response is required, Anthropic denies the allegations in Paragraph 37, including that Plaintiff is entitled to any recovery in this action.

38. Anthropic admits Exhibit H ("Declaration of Non-Objection by James Whitehead II") appears to be a declaration by James Whitehead II, executed on June 24, 2026. To the extent Paragraph 38 purports to summarize or characterize the contents of Exhibit H, the exhibit speaks for itself and requires no admission or denial. To the extent a response is deemed required, Anthropic lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 38 and therefore denies them.

39. To the extent the allegations in Paragraph 39 purport to provide legal conclusions, no response is required. As to the remaining allegations, Anthropic is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39 and, on that basis, denies the allegations.

40. Anthropic admits Exhibit I ("Covenant Not to Sue Anthropic PBC by James Whitehead II") appears to be a covenant not to sue Anthropic PBC by James Whitehead II, executed on June 24, 2026. To the extent Paragraph 40 purports to summarize or characterize the contents of Exhibit I, the exhibit speaks for itself and requires no admission or denial. To the extent a response is deemed required, Anthropic lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 40 and therefore denies them.

41. Paragraph 41 characterizes Plaintiff's pleading and states legal conclusions to which no response is required. To the extent a response is deemed required, Anthropic denies the allegations in Paragraph 41.

42. Anthropic admits that Wiley has not been joined as a party to this action and restates and incorporates by reference its responses to the allegations contained in Paragraphs 33–37. As to any legal conclusions asserted in Paragraph 42, no response is required. Anthropic is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42 and, on that basis, denies the allegations.

43. Paragraph 43 states a legal conclusion to which no response is required. To the extent a response is deemed required, Anthropic lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 43 and therefore denies them.

44. Anthropic admits that Whitehead has not been joined as a party to this action and restates and incorporates by reference its responses to the allegations contained in Paragraphs 38 and 40. Anthropic denies the remaining allegations in Paragraph 44.

45. Denied.

46. Anthropic admits that it downloaded certain books in 2021 and 2022 for the fair use purposes of training its highly-transformative large-language models ("LLMs" or "models"). Anthropic denies the remaining allegations and legal conclusions in Paragraph 46.

47. Anthropic admits that it downloaded certain books in 2021 and 2022 from LibGen and PiLiMi. Anthropic denies the remaining allegations and legal conclusions in Paragraph 47.

48. To the extent the allegations set forth in Paragraph 48 purport to summarize or characterize the contents of *Bartz v. Anthropic PBC*, No. 3:24-cv-05417-WHA, ECF No. 244 (N.D. Cal. July 17, 2025) ("*Bartz* Class Certification Order"), ECF No. 1 (N.D. Cal. Aug. 19, 2024) ("*Bartz* Class-Action Complaint"), and ECF No. 363-3 (Sept. 5, 2025) ("*Bartz* Settlement Agreement"), the records speak for themselves. The contents of the records are public information which requires no admission or denial. Except as expressly admitted, Anthropic denies the remaining allegations and/or legal conclusions in Paragraph 48.

49. Denied.

50. Anthropic denies the allegations in Paragraph 50 including that any authorization or license was required.

51. To the extent the allegations set forth in Paragraph 51 purport to summarize or characterize the contents of *Bartz* Class Certification Order, Class-Action Complaint, and Settlement Agreement, the records speak for themselves. The contents of the records are public information which requires no admission or denial. To the extent a response is required, Anthropic admits that certain parties commenced the *Bartz* class action, that the parties reached a settlement, and that the *Bartz* Works List is searchable. Except as expressly admitted, Anthropic denies the remaining allegations and/or legal conclusions in Paragraph 51.

52. Anthropic admits Exhibit J ("*Bartz* Works List Entry") appears to be an Attestation of Plaintiff and a screenshot of https://secure.anthropiccopyrightsettlement.com/lookup upon searching *Hacking World of Warcraft* by title. To the extent Paragraph 52 purports to summarize or characterize the contents of Exhibit J and the *Bartz* Settlement Agreement, the records speak for themselves. The contents of the Exhibit J and the *Bartz* Settlement Agreement are public information which requires no admission or denial. Anthropic otherwise denies the remaining allegations and/or legal conclusions in Paragraph 52.

53. Anthropic admits Exhibit K ("LibGen Screenshot") appears to be an Attestation of Plaintiff and a screenshot of the LibGen Website for *Hacking World of Warcraft* at https://libgen.vg/edition.php?id=136270335 (archived at https://perma.cc/CQ6J-EBYT). To the extent Paragraph 53 purports to summarize or characterize the contents of Exhibit K and Anna's Archive Record for *Hacking World of Warcraft* (archived at https://perma.cc/G8WC-W5YF), the records speak for themselves. The contents of Exhibit K and Anna's Archive Record are public information which requires no admission or denial. Anthropic otherwise denies the remaining allegations and/or legal conclusions in Paragraph 53.

54. Anthropic admits that Plaintiff purports to have opted the Work out of the *Bartz* settlement. The remaining allegations in Paragraph 54 are legal conclusions to which no response

is required. To the extent a response is deemed required, denied.

55. Anthropic admits Exhibit L ("Plaintiff's Opt-Out Submission Letter and Proof of Receipt") appears to be a letter from Plaintiff to the *Bartz* Settlement Administrator, a U.S. Postal Service Certified Mail Receipt, and an automatic reply from the Anthropic Copyright Settlement email address to Plaintiff, all dated January 9, 2026. To the extent the allegations set forth in Paragraph 55 purport to summarize or characterize the contents of Exhibit L, the exhibit speaks for itself and requires no admission or denial. To the extent a response is deemed required, Anthropic lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 55 and therefore denies them.

56. Anthropic admits Exhibit M ("Opt-Out Confirmation Email") appears to be an email from Plaintiff to the Anthropic Copyright Settlement email address, dated June 12, 2026, and a response email from the Settlement Administrator dated June 15, 2026. To the extent the allegations set forth Paragraph 56 purport to summarize or characterize the contents of Exhibit M, the exhibit speaks for itself and requires no admission or denial. To the extent a response is deemed required, Anthropic lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 56 and therefore denies them.

57. To the extent the allegations set forth Paragraph 57 purport to summarize or characterize the contents of Exhibits L and M and the *Bartz* Settlement Agreement, those records are public information which require no admission or denial. To the extent a response is deemed required, Anthropic lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 57 and therefore denies them.

58. To the extent the allegations set forth in Paragraph 58 purport to summarize or characterize the contents of the *Bartz* Settlement Agreement, the record speaks for itself. The contents of the *Bartz* Settlement Agreement is public information which requires no admission or denial. As to any legal conclusions in Paragraph 58, no response is required; and to the extent a response is deemed required, denied.

59. To the extent the allegations in Paragraph 59 purport to summarize or characterize the contents of Exhibits J and K and the *Bartz* Settlement Agreement, *Bartz* Class Certification Order, and *Bartz v. Anthropic PBC,* No. 3:24-cv-05417-WHA, ECF No. 231 (N.D. Cal. June 23, 2025) ("*Bartz* Fair Use Order"), the records speak for themselves. The contents of the *Bartz* Settlement Agreement, Class Certification Order, and Fair Use Order are public information which require no admission or denial. Anthropic incorporates by reference its responses to Paragraphs 52–53 and otherwise denies the allegations in Paragraph 59.

60. To the extent certain allegations set forth in Paragraph 60 purport to summarize or characterize the contents of the *Bartz* Fair Use and Class Certification Orders, the Orders speak for themselves. The contents of the Orders are public information which requires no admission or denial; and to the extent a response is deemed required, denied. Anthropic otherwise denies the allegations in Paragraph 60.

61. Denied.

62. To the extent the allegations in Paragraph 62 purport to summarize or characterize the contents of the *Bartz* Fair Use Order, the Order speaks for itself. The contents of the *Bartz* Fair Use Order is public information which requires no admission or denial. Anthropic otherwise denies the allegations and legal conclusions in Paragraph 62.

63. Denied.

64. Admitted that Anthropic never offered any unauthorized copies of the Work for sale or displayed the Work online. Admitted that the download and/or use of any copy of the Work for the highly-transformative purpose of LLM training was done inside Anthropic's private systems, not visible to Plaintiff or the public. Unless expressly admitted, Anthropic denies the remaining allegations and legal conclusions in Paragraph 64 (including but not limited to that it engaged in any infringement or otherwise unlawful conduct).

65. Denied.

66. Anthropic is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 66 concerning unidentified "public discussion," and denies the allegations in Paragraph 66.

67. Denied.

68. Anthropic is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 68 and, on that basis, denies the allegations.

69. Anthropic is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 69 and, on that basis, denies the allegations. To the extent Paragraph 69 purports to summarize or characterize the contents of Exhibit J, the exhibit speaks for itself. The contents of Exhibit J is public information which requires no admission or denial. To the extent a response is required, denied.

70. To the extent the allegations set forth in Paragraph 70 purport to summarize or characterize the contents of Exhibits L and M, the exhibits speak for themselves and require no admission or denial. Anthropic restates and incorporates by reference its responses to the allegations contained in Paragraphs 55–56. Anthropic is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 70 and, on that basis, denies the remaining allegations.

71. Anthropic admits that Plaintiff wrote to Defendant concerning alleged infringement of the Work by letter dated January 31, 2026 and filed this action on May 26, 2026. To the extent the allegations set forth Paragraph 71 purport to summarize or characterize the contents of Exhibits E, L, and M, the exhibits speak for themselves and require no admission or denial. Anthropic restates and incorporates by reference its responses to the allegations contained in Paragraphs 33 and 55–56. Except as expressly admitted, Anthropic denies the remaining allegations in Paragraph 71.

72. Denied.

73. Denied.

74. Paragraph 74 states a legal conclusion to which no response is required. To the extent a response is deemed required, Anthropic denies the allegations in Paragraph 74.

75. Paragraph 75 states a legal conclusion to which no response is required. To the extent a response is deemed required, Anthropic denies the allegations in Paragraph 75 and restates and incorporates by reference its responses to the allegations contained in Paragraphs 54–56 and 62.

## CLAIM FOR RELIEF

76. Anthropic restates and incorporates by reference its responses to the allegations contained in Paragraphs 1–75 above as fully set forth herein

77. Denied.

78. Paragraph 78 states a legal conclusion to which no response is required. To the extent a response is deemed required, Anthropic denies the allegations in Paragraph 78.

79. Denied.

80. Anthropic restates and incorporates by reference its responses to the allegations contained in Paragraphs 47 and 49 and denies the allegations in Paragraph 80.

81. Anthropic denies the allegations set forth in Paragraph 81 including that any damages are proper.

## PRAYER FOR RELIEF

Regarding paragraphs A through G of PRAYER FOR RELIEF, Anthropic denies each and every claim for relief set forth by Plaintiff.

## AFFIRMATIVE DEFENSES

Anthropic asserts the following affirmative defenses, without assuming the burden of proof on such defenses that would otherwise fall on Plaintiff. Anthropic reserves the right to supplement

or amend these defenses during and after the course of discovery, and does not knowingly or intentionally waive any applicable affirmative defense**.**

**FIRST AFFIRMATIVE DEFENSE**

**(Fair Use)**

Plaintiff's claim for direct copyright infringement fails, in whole or in part, based on fair use under 17 U.S.C. § 107.

**SECOND AFFIRMATIVE DEFENSE**

**(Copyright Standing)**

Plaintiff's claim fails, in whole or in part, for lack of legal or beneficial ownership sufficient to establish standing to sue for copyright infringement.

**THIRD AFFIRMATIVE DEFENSE**

**(Failure to Join a Necessary and Indispensable Party)**

Plaintiff's claims are barred by reason of Plaintiff's failure to join an indispensable or necessary party.

**FOURTH AFFIRMATIVE DEFENSE**

**(Works or Elements of Works Not Protectable by Copyright)**

Plaintiff's claim fails, in whole or in part, to the extent Plaintiff claims rights to elements of the Work or to the Work which are not protectable under copyright law, such as under the doctrines of scènes à faire, merger, the idea/expression dichotomy, or under 17 U.S.C. § 102(b).

**FIFTH AFFIRMATIVE DEFENSE**

**(De Minimis Copying)**

Plaintiff's claim for copyright infringement fails, in whole or in part, because it is barred by the doctrine of *de minimis* copying.

**SIXTH AFFIRMATIVE DEFENSE**

**(Lack of Injury)**

Plaintiff's claim fails, in whole or in part, because Plaintiff has not suffered and is not likely to suffer any injury or damages as a result of the conduct alleged of Anthropic in the First Amended Complaint.

**SEVENTH AFFIRMATIVE DEFENSE**

**(Waiver, Estoppel, Laches)**

Plaintiff's claim is barred, in whole or in part, by one or more other equitable doctrines, such as waiver, estoppel, and laches.

**EIGHTH AFFIRMATIVE DEFENSE**

**(Unavailability of Injunctive Relief)**

Plaintiff's claim fails, in whole or in part, because Plaintiff is not entitled to injunctive relief, including because Plaintiff has not articulated the nature, scope, or terms of the injunction sought, any injury to Plaintiff is not irreparable, Plaintiff would have an adequate remedy at law, the balance of hardships favors no injunction, and the public interest is best served by no injunction.

**NINTH AFFIRMATIVE DEFENSE**

**(Innocent Infringement)**

To the extent Plaintiff establishes any act of infringement, that infringement was innocent, allowing for the Court to reduce any award of statutory damages to an amount as low as $200 per work infringed. 17 U.S.C. § 504(c)(2).

**TENTH AFFIRMATIVE DEFENSE**

**(Unconstitutional Damages)**

Plaintiff seeks improper damages in violation of the United States Constitution and other applicable law. Any award of statutory or enhanced damages would constitute an unconstitutional penalty under the circumstances of this case and would violate the due process and equal protection guarantees, and other substantive and procedural safeguards afforded by the United States Constitution.

**ELEVENTH AFFIRMATIVE DEFENSE**

**(Statute of Limitations)**

Plaintiff's remedies are barred at least in part by the applicable statute of limitations.

**TWELFTH AFFIRMATIVE DEFENSE**

**(Waiver)**

As a result of Plaintiff's own conduct, statements, and admissions, Plaintiff has waived any cause of action and/or claim for relief and thus is barred from maintaining such action or obtaining any judgment or relief against Anthropic.

**THIRTEENTH AFFIRMATIVE DEFENSE**

**(Co-Ownership – Limitation of Recovery)**

Plaintiff's recovery, if any, is limited to Plaintiff's own proportionate or beneficial ownership interest and does not extend to damages or other relief attributable to the interest of any co-author, publisher, or other co-owner or legal owner of the copyright or exclusive rights at issue, whether or not joined as a party.

**FOURTEENTH AFFIRMATIVE DEFENSE**

**(First Amendment)**

Plaintiff's claim, as applied to Anthropic's conduct, is barred in whole or in part by the First Amendment. Alternatively, the doctrine of constitutional avoidance requires the statutory provisions at issue to be construed in a manner that avoids the constitutional question altogether.

**RESERVATION OF ADDITIONAL DEFENSES**

Anthropic's investigation of the claim and its defenses is continuing. Anthropic has not knowingly or intentionally waived any applicable defenses and reserves the right to assert and rely on other applicable defenses as may become available or apparent during discovery in this matter. Anthropic reserves the right to amend this Answer and/or its affirmative defenses.

## DECLARATORY JUDGMENT COUNTERCLAIM

Defendant and Counterclaim-Plaintiff Anthropic PBC alleges the following counterclaim for declaratory judgment against Plaintiff and Counterclaim-Defendant Daniel Benjamin Gilbert.

## INTRODUCTION

82. Anthropic brings this counterclaim to resolve an actual, live controversy of Mr. Gilbert's making. Mr. Gilbert filed this case accusing Anthropic of copyright infringement for downloading his Work, yet maintains he has "severed" his claim from Anthropic's subsequent "use" of the Work. And he claims this artful pleading maneuver precludes Anthropic from asserting a copyright fair use defense based on its post-acquisition transformative use of the Work.

83. Mr. Gilbert's First Amended Complaint targets Anthropic's acquisition of his work—the initial download and storage of the Work—as supposedly distinct from Anthropic's transformative use of the Work to develop its large language models ("LLMs" or "models"). He alleges Anthropic acquired the Work and acknowledges Anthropic used the Work to develop LLMs, but then he expressly disclaims challenging any of Anthropic's post-acquisition use of the Work—whether that use was fair use or not.

84. Mr. Gilbert has since confirmed, in writing, that this framing is deliberate. He contends that a claim limited to Anthropic's acquisition of the Work is allegedly "severable" from any post-acquisition use of the Work—even though the acquisition served a single, fair use purpose.

85. That theory does not fit the facts of how Anthropic acquired, stored, or used the Work. Nor does it comport with the law of fair use. Anthropic's acquisition and LLM development uses of the Work were not separate undertakings serving separate purposes; the acquisition existed only to enable LLM training and other LLM development activities, and those activities are inseparable from any assessment of whether the initial acquisition was fair use.

86. Fair use turns on "the purpose and character of the use," 17 U.S.C. § 107(1), and no court can decide whether acquiring the Work was lawful without examining why the Work was acquired and how it was used. Here, the answer to both questions is the same: to train, develop, and improve Anthropic's LLMs and to build guardrails that stop those LLMs from reproducing portions of the Work.

87. Accepting Mr. Gilbert's pleading theory would effectively nullify the doctrine of fair use codified by Congress. All fair uses of a copyrighted work involve first acquiring a copy of the work. Such acquisition is inseparable from the fair use it enables. For this reason, the fair use doctrine does not isolate each copy made during the process of acquiring and using a work. Rather, the doctrine focuses on the "ultimate use" of the work and immunizes Copyright Act liability for copies made for that purpose—including copies made at the moment of acquisition, such as "downloading." *See, e.g.*, *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1047–48 (N.D. Cal. 2025) ("Because Meta's ultimate use of the plaintiffs' books was transformative, so too was Meta's downloading of those books.").

88. Mr. Gilbert cannot use artful pleading to divide a single course of conduct into two separate legal questions, litigate only the portion he thinks he can win, and foreclose Anthropic's fair use defense as to the whole. If Mr. Gilbert's severance theory succeeds, Anthropic will have litigated this action to judgment without ever obtaining a ruling on the very facts—why it acquired the Work and what it did with the Work—that determine whether both acquisition and use of the Work was lawful. That is precisely the kind of continuing, unresolved exposure that the Declaratory Judgment Act exists to prevent.

89. Anthropic accordingly seeks a declaration that its acquisition and use of the Work, in all of the respects addressed below, was fair use under 17 U.S.C. § 107 and did not infringe any right Mr. Gilbert holds.

## THE PARTIES

90. Anthropic PBC is a Delaware public benefit corporation with its principal place of business in San Francisco, California.

91. Mr. Gilbert alleges that he is an individual residing in Easthampton, Massachusetts. He alleges he is a beneficial owner of *Hacking World of Warcraft* which is allegedly registered with the United States Copyright Office under Registration No. TX 7-204-548.

## JURISDICTION AND VENUE

92. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). Anthropic's counterclaim arises under the Copyright Act, 17 U.S.C. § 101 *et seq.*, and seeks declaratory relief under 28 U.S.C. §§ 2201 and 2202. An actual controversy exists between Anthropic and Mr. Gilbert within the meaning of 28 U.S.C. § 2201(a).

93. This Court has personal jurisdiction over Mr. Gilbert. Mr. Gilbert resides in this District, and he consented to the Court's jurisdiction by filing this action.

94. Venue is proper in this District under 28 U.S.C. §§ 1391(b) and 1400(a).

## FACTUAL BACKGROUND

### A. Anthropic and its Development of Large Language Models

95. Anthropic was founded in 2021 on the animating principle that the most capable AI systems should also be the safest. That principle is embedded in Anthropic's corporate charter and governance. As a public benefit corporation, Anthropic balances stockholder interests with its public benefit purpose of responsibly developing and maintaining advanced AI tools for the long-term benefit of humanity.

96. Anthropic began as a research company. In its early days, Anthropic studied LLM development and published research on the safety risks and opportunities presented by increasingly capable AI systems. *See, e.g.*, Amanda Askell et al., *A General Language Assistant as a Laboratory for Alignment*, arXiv:2112.00861v3 [cs.CL] (Dec. 9, 2021) (available at

https://arxiv.org/pdf/2112.00861) (Anthropic research paper; "Given the broad capabilities of large language models, it should be possible to work towards a general-purpose, text-based assistant that is aligned with human values, meaning that it is helpful, honest, and harmless."); Yuntao Bai et al., *Constitutional AI: Harmlessness from AI Feedback*, arXiv:2212.08073 [cs.CL] (Dec. 15, 2022) (available at https://arxiv.org/pdf/2212.08073) (Anthropic research paper describing "methods for training a harmless AI assistant through self-improvement," in which the model is trained against an explicit set of written safety principles—a "constitution").

97. Anthropic's founders eventually concluded that the best way to demonstrate that AI safety and commercial success were compatible was to train a publicly available model.

98. By way of technical background, an LLM starts as an untrained neural network: a computational model built from layers of interconnected nodes that loosely mimic the structure of a human brain. Engineers expose the neural network to an enormous body of text, called a training corpus. The network analyzes that text in context, learning statistical relationships between words and concepts. Those relationships are reflected in numerical values, called parameters, that capture how words and ideas relate to each other. This training is what allows an LLM to interpret human language and respond usefully to new queries. The training corpus itself is not stored in the trained model, and the model does not consult the corpus once it is trained. Instead, the model uses its parameters to predict, token by token, how to respond to a new prompt.

99. An LLM must be trained on vast amounts of data; it is a technical requirement, not a design or style choice. The statistical patterns an LLM needs to learn only become reliable, and generalize to new topics, when the model is trained on a very large volume of text—on the order of trillions of words for a model like Claude. That is more than twice the number of words in every book ever written. Training on too little data limits a model to a narrow set of tasks and gives it a weaker grasp of human language and facts about the world. The data also must be diverse in subject matter and style; a model trained only on one type of text performs poorly outside that domain.

100. Books are one useful source of long-form, high-quality text used for this LLM training purpose, but they make up only a small fraction of the total data needed; the rest comes from sources like web pages, scientific papers, and computer code. No single work is necessary, nor sufficient, to train an LLM—an AI developer needs a sufficiently massive and diverse mix of text to build a successful general purpose LLM.

101. Considering these scale and diversity requirements, Anthropic acquired text from many sources to begin its research and development of LLMs. Two such sources were LibGen and PiLiMi, online repositories containing digitized text from a large number of books, among other text data. Anthropic downloaded text files of books and other data from LibGen in 2021 and then PiLiMi in 2022 for the sole purpose of using the data to train and develop LLMs. At least some portion of the Work was included in the LibGen and PiLiMi versions Anthropic downloaded.

102. This was before Anthropic developed any commercial product or publicly accessible LLM. Anthropic used books from the LibGen and PiLiMi datasets in LLM research training runs between 2021 and late 2022. A training run is the process of exposing a neural network to a training corpus so it can learn the statistical relationships that become the model's parameters. Based on this research and development, Anthropic planned to conduct a training run that would result in a publicly available model.

103. In mid-to-late 2022, Anthropic began a training run that it believed could become its first publicly available model. This training run included data from books acquired from the LibGen and PiLiMi databases. However, in Fall 2022, Anthropic decided to change course and not use any LibGen- or PiLiMi-sourced text to train any model that could ultimately result in a commercial product.

104. Therefore, Anthropic halted this training run entirely in October 2022, removed PiLiMi and LibGen data, and then began a new training run using a modified training corpus that did not contain PiLiMi and LibGen-sourced data. The decision to stop the Fall 2022 training run, remove LibGen and PiLiMi data, and start a new training run cost Anthropic approximately $5

million. The resulting model ultimately became Claude 1, Anthropic's first publicly available and commercial model, which launched in March 2023.

105. Anthropic continued developing its models and explored other ways to obtain the volume and quality of book text an LLM requires. Beginning in early 2024, Anthropic evaluated the potential for licensing electronic books directly from publishers. After months of discussions with publishers of all types—trade, academic, professional, and self-publishing platforms—Anthropic concluded that no licensing market existed, or could be assembled through publisher-by-publisher negotiation, at a scale remotely approaching what training an LLM requires. Relative to the book publishing industry's output, very few books were available to license at any price, and where publishers did offer books, the volumes offered were small relative to LLM training needs and the prices demanded were not economically feasible given the incremental training value those books would provide.

106. Having concluded that licensing could not meet its needs, Anthropic shifted its approach to purchasing physical and primarily used books on the open market and scanning them to create training datasets. Anthropic has invested tens of millions of dollars purchasing millions of books on the open market for use as training text. The Work was included in one of these bulk purchases for use to train one or more of Anthropic's commercial models.

107. Moreover, while Anthropic stopped using LibGen-sourced text for model training in 2022 and did not use LibGen-sourced text for training any model that was released publicly or commercially, Anthropic continues to use text sourced from the LibGen database, along with other data, to develop and maintain copyright guardrails.

108. One such guardrail is Anthropic's Content Compare System (or "CCS"). CCS is a recitation checker: a tool that compares a candidate output against a reference dataset to determine whether Claude's generated output matches, or closely resembles, content in that dataset. Thus, before Claude's output reaches a user, CCS checks it against the reference dataset, including data from LibGen.

109. If the system detects a match, it blocks the output from being produced. The reference dataset draws on text from many sources, including text originally sourced from LibGen, used here not for its expressive content but solely as a benchmark against which to measure Claude's own generated text. Thus, for example, while one of Anthropic's commercial models may have been developed with a training corpus including the Work—among a vast amount of other text—CCS prevents the models from outputting content from the Work.

**B. The *Bartz v. Anthropic* Class Action**

110. Mr. Gilbert filed this action in the wake of the *Bartz v. Anthropic* class action settlement. *See* No. 3:24-cv-05417 (N.D. Cal.).

111. In *Bartz*, book authors sued Anthropic for copyright infringement for acquiring books from LibGen, PiLiMi, and other sources and using them to train LLMs. Anthropic moved for summary judgment on the grounds of fair use. The *Bartz* court held that Anthropic's use of the works for LLM training constituted fair use. *See Bartz*, 787 F. Supp. 3d 1007, 1021 (N.D. Cal. 2025) ("[T]he 'purpose and character' of using works to train LLMs was transformative — spectacularly so."). The court also found it was fair use when Anthropic purchased, scanned, and digitized books—finding that the "mere format change was a fair use." *Id*. at 1023.

112. However, as to books sourced from online repositories created by third parties allegedly without the consent of the copyright owners—described by the court as "pirated libraries"—the *Bartz* court found disputed facts as to whether LLM development was Anthropic's *only* purpose for acquiring the books. Rather, the court suggested that Anthropic's purpose might have been to build a "general-purpose library," separate and independent of using the texts for LLM development. See *Bartz,* 787 F. Supp. 3d at 1019. The *Bartz* court did not elaborate on what purpose Anthropic might have had apart from LLM development.

113. This factual finding was erroneous and not supported in the record. Anthropic is and was a company focused on the research and development of LLMs and policy advocacy for

safe AI development to benefit humanity. Anthropic is not in the business of building or maintaining libraries, and its employees did not access book data in order to read it. Anthropic is not in the business of distributing books. And Anthropic had no purpose for acquiring books other than for using the books' text as part of developing LLMs. Anthropic was not building a "general-purpose library," a concept not described in the court's order and implausible based on the context of the evidence cited in the *Bartz* court's order. At all times, Anthropic's sole purpose for acquiring book text—whether from LibGen, PiLiMi, or any other source—was to use it for the transformative purpose of developing LLMs.

114. Nevertheless, drawing all inferences of the facts in favor of the class plaintiffs, the *Bartz* court denied Anthropic summary judgment of fair use for all works that were acquired from "pirated" sources—*e.g.*, LibGen and PiLiMi—and reserved for trial the question of whether Anthropic had a fair use purpose for downloading the works (*i.e.*, LLM development) or instead whether Anthropic's purpose was to build a "general-purpose library." *See* 787 F. Supp. 3d at 1034 ("We will have a trial on the pirated copies . . . ."). Thereafter, the *Bartz* court certified a class consistent with the summary judgment ruling: "All beneficial or legal copyright owners of the exclusive right to reproduce copies of any book in the versions of LibGen or PiLiMi downloaded by Anthropic." *Bartz*, 791 F. Supp. 3d 1038, 1065 (N.D. Cal. 2025).

115. Subsequently, in a similar copyright infringement class action brought by authors against Meta for downloading books from LibGen to train its LLM, Llama, the court granted summary judgment for Meta on the grounds of fair use, concluding that such use was "highly transformative." *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1060 (N.D. Cal. 2025). The *Kadrey* court notably disagreed with the *Bartz* court's analytical distinction between downloading books and saving them to an internal database, on the one hand, and their subsequent use in LLM development, on the other hand:

> The last issue relating to the character of Meta's use (and thus the first factor) is the relationship between Meta's downloading of the plaintiffs' books and Meta's use of the books to train Llama. To the extent the plaintiffs suggest that the former must

> be considered wholly separately from the latter, they are wrong. To be sure, Meta's downloading is a different use from any copying done in the course of LLM training. But that downloading must still be considered in light of its ultimate, highly transformative purpose: training Llama. *See Authors Guild v. Google, Inc. (Google Books)*, 804 F.3d 202, 216-18 (2d Cir. 2015) (considering the creation of digital copies of books in light of the secondary user's overall purpose of creating a searchable database); *cf. Warhol*, 598 U.S. at 533 (noting that different uses must be considered separately, but that "the same copying may be fair when used for one purpose but not another"); *contra* Order on Fair Use at 18, *Bartz*, No. 24-cv-5417. Because Meta's ultimate use of the plaintiffs' books was transformative, so too was Meta's downloading of those books.

*Kadrey*, 788 F. Supp. 3d at 1047–48.

116. Anthropic thereafter sought permission in *Bartz* to take an interlocutory appeal to the Ninth Circuit to seek reversal of the court's denial of summary judgment based on fair use. The district court denied that request and reiterated that whether Anthropic's purpose was for training LLMs—and thus, whether the downloads also constituted fair use—was to be decided at trial. *See Bartz*, No. 24-cv-5417-WHA, 2025 WL 2308091, at *3 (N.D. Cal. Aug. 11, 2025) ("Anthropic has maintained . . . that there was only one use, a fair use — training LLMs. And, the district court's orders have maintained that Anthropic will have every opportunity to perfect its affirmative defense at trial, presenting evidence for the jury to find the underlying facts needed for the judge to decide fair use in its favor (or not).").

117. Thereafter, Anthropic and the *Bartz* class counsel entered a class-wide settlement. The settlement provides claimants—authors and publishers—approximately $3,000 per work that Anthropic downloaded as part of the LibGen or PiLiMi datasets. The settlement permitted either the authors or publishers of any work to opt out of the settlement, which would then automatically opt out any other authors or publishers of the same work. There are 482,460 works subject to the settlement release in *Bartz*, of which fewer than 2,000 works were opted out. The *Bartz* court then entered final approval of the class settlement—overruling objections to the settlement, in part, on the grounds that a subsequent trial or appeal could confirm Anthropic's "fair use" defense. No. 24-cv-5417-AMO, Dkt. 680 at 19 (N.D. Cal. July 20, 2026).

**C. Mr. Gilbert's Attempt to Preclude Anthropic's Fair Use Defense**

118. Mr. Gilbert filed the present action against Anthropic alleging copyright infringement of the Work for downloading the book from LibGen and PiLiMi, following what he alleges was a timely opt-out from the *Bartz* class settlement.

119. Mr. Gilbert's First Amended Complaint acknowledges that Anthropic acquired books for the purpose of developing LLMs. *See* Dkt. 23 ¶ 8 ("Defendant assembled, reproduced, stored, and retained its library of pirated books as a commercial resource for the development, training, improvement, and operation of Defendant's Claude large language models and related commercial products and services . . . .").

120. However, in the same pleading Mr. Gilbert included allegations that could be construed as attempting to sever the download from the subsequent use of his work for LLM training and development: "Plaintiff's claim is for Defendant's unauthorized downloading and reproduction of the Work, not for model training; the library containing the Work served Defendant's enterprise as a general-purpose resource whether or not the Work or the LibGen collection appeared in the training corpus of any commercially released model." *Id.* ¶ 12.

121. Mr. Gilbert's framing in the First Amended Complaint could be construed as preventing Anthropic from asserting a fair use defense or introducing the fair use issue at all. Anthropic filed a declaratory judgment counterclaim to ensure fair use is properly at issue and considered in this case despite Mr. Gilbert's allegations. *See* Dkt. 28 ¶¶ 96–106.

122. Thereafter, Mr. Gilbert emailed counsel for Anthropic, indicating that he intended to seek dismissal of Anthropic's counterclaim for lack of case-or-controversy on the grounds that he has limited his claim to downloads and not training: "The Declaratory Judgment Act requires an actual controversy between the parties. None exists here about Training Uses: my complaint claims unauthorized reproduction of the Work and expressly declines to challenge Training Uses."

123. Mr. Gilbert then further confirmed exactly why Anthropic must bring this declaratory judgment claim—Mr. Gilbert is attempting to "sever" his claim specifically to preclude Anthropic from relying on a fair use defense arising from Anthropic's purpose for acquiring the Work. He maintains that claims for acquisition and use are "severable," only acquisition is at issue under his First Amended Complaint, only acquisition is at issue for purposes of discovery, and Anthropic's purpose and use of the work—key inquiries of fair use—are not part of the case:

> I'll ask the Court to decline the Training Uses declaration under the DJA's grant of discretion (Wilton v. Seven Falls). [¶] In the further alternative, I'll ask the Court to confirm that the counterclaim will be adjudicated as coextensive with my pleaded claims, on the same record, with no discovery aimed solely at the fairness or lawfulness of Training Uses. [¶] Because fair use is evaluated use by use, the Training Uses declaration is a severable question, and partial dismissal is proper (Warhol v. Goldsmith).

124. As explained, Mr. Gilbert's position would be an end-run around the fair use statute, which assumes acquisition and copying of the work and asks courts to weigh "the purpose and character of the use." 17 U.S.C. § 107(1). Every fair use necessarily begins with some act of copying or acquisition; if that act were independently determinative, the doctrine could never apply. Because the statute directs courts to the ultimate use rather than the manner of acquisition, acquisition cannot by itself decide the fair use analysis. But that error of law would be the result if Mr. Gilbert's pleading theory precluded consideration of Anthropic's purpose and use of the Work.

125. Therefore, given Mr. Gilbert's further elaboration on how his pleading should be construed—as a "sever[ed]" claim ostensibly precluding consideration of Anthropic's fair use defense—Anthropic now files the present Amended Answer to clarify the nature of the controversy between the parties to ensure Anthropic's purpose and use, and other facts relevant to fair use, are properly at issue in this case. The declaration Anthropic seeks turns on the same core conduct and operative facts underlying Mr. Gilbert's own claim. Resolving it requires no separate proceeding—only that the Court consider the whole of the conduct Mr. Gilbert has put at issue.

## COUNTERCLAIM

### (Declaratory Judgment of Non-Infringement)

126. Anthropic realleges and incorporates the allegations of the preceding Paragraphs 82 to 125 in this Counterclaim.

127. An actual controversy exists between Anthropic and Mr. Gilbert concerning whether Anthropic has infringed any exclusive right in the Work in which Mr. Gilbert holds a valid interest—necessitating judicial declaration from this Court to resolve the controversy.

128. Anthropic has not infringed any exclusive right in the Work. To the extent Anthropic acquired, downloaded, stored, or retained the Work, or any portion of the Work—as alleged in Mr. Gilbert's First Amended Complaint—such acquisition, download, storage, or retention was for the purpose of training, developing, or offering Anthropic's LLMs. Such use constitutes fair use under 17 U.S.C. § 107 and/or was otherwise non-infringing.

### A. Anthropic's online downloads of the Work used for LLM research training runs are fair use

129. Anthropic's early research studied the safety risks and opportunities of increasingly capable AI systems, including how to build models that are helpful, honest, and harmless. As part of this research, Anthropic downloaded some portion of text from the Work—among text from many other books—from LibGen and PiLiMi in 2021 and 2022, respectively, for LLM training research, before Anthropic had any commercial product.

130. Anthropic used that text in research training runs for the purpose of studying LLM training methods and developing the techniques that would later inform safe, commercial model development. Anthropic used the Work, along with billions of words from other sources in its training corpora, to train research LLMs that map statistical relationships between words so they can generate new and original text in response to prompts. That training process treats the Work the same way it treats any other fragment of language in the training set: not as a book to be read for its expressive content, but as a source of data among billions of other data points used to learn

how language works. And these research models were never released publicly or commercialized.

131. No LibGen- or PiLiMi-sourced text, including the Work, was included in the training corpus of Claude 1 or any other publicly released or commercially available model. As explained, Anthropic made a deliberate decision to remove LibGen- and PiLiMi-sourced text from the training corpora of what would become its publicly accessible commercial models.

132. Mr. Gilbert does not allege that any research model output reproduces the Work's expressive content. Anthropic's back-end use of a copy of the Work for LLM research training—an intermediate copy, at best, that is not accessible to the public—is not a public-facing use that competes with or replaces the Work. That combination—an unrelated purpose, and no output that stands in for the original—is the hallmark of transformative use.

133. That same transformative purpose also forecloses any cognizable market harm. Mr. Gilbert does not allege that any research model output has ever reproduced the Work's text or displaced a sale of the Work. Because no output stands in for the Work, Anthropic's use does not compete with the Work in the market where the Work is sold.

134. A reader seeking instructions on modifying gaming features in *World of Warcraft* gains nothing from Anthropic's use that substitutes for the Work's specific technical content.

135. Nor did Anthropic's use displace any functioning or plausible licensing market, let alone one Mr. Gilbert was entitled to control under the Copyright Act. No functioning market existed for licensing the Work for model training.

136. These factors—among others to be developed in discovery—confirm that any use of Mr. Gilbert's Work for LLM development and training is fair and does not constitute copyright infringement. The acquisition of the Work was similarly a fair use under the Copyright Act as it was done for the purpose of transformative LLM training and development.

**B. Anthropic's purchased and scanned copy of the Work used for LLM training is fair use**

137. After shifting away from book text sourced from LibGen and PiLiMi for any commercial LLM, Anthropic separately purchased a physical copy of the Work on the open market and scanned it for use in a training corpus for one or more commercially released models. The scan converted the physical copy into a machine-readable format for the same transformative training purpose described above: extracting statistical relationships between words and concepts, not reproducing the Work's expressive content.

138. This use was equally transformative. The model draws on the Work's text, along with billions of other data points, to learn how language works generally. Anthropic used the Work, along with billions of other texts in its training corpora, to train LLMs that map statistical relationships between words so that they can generate new and original text in response to a user's prompt. That training process treats the Work the same way it treats any other fragment of language in the training set: not as a book to be read for its expressive content, but as a source of data among billions of other data points used to learn how language works.

139. The model that results can write code, draft emails, summarize documents, and answer questions across an open set of subjects having nothing to do with the Work's content. No output of that training process gives any end user access to the Work. Anthropic's models do not reproduce the Work to end users, do not summarize it, and do not provide a substitute for buying or reading it.

140. Mr. Gilbert does not allege that any model output reproduces the Work's expressive content. Anthropic's back-end use of a copy of the Work for LLM training—an intermediate copy, at best, that is not accessible to the public—is not a public-facing use that competes with or replaces the Work. That combination—an unrelated purpose, and no output that stands in for the original—is the hallmark of transformative use.

141. That same transformative purpose also forecloses any cognizable market harm. Mr. Gilbert does not allege that any Anthropic LLM output has ever reproduced the Work's text or displaced a sale of the Work. Because no output stands in for the Work, Anthropic's use does not compete with the Work in the market where the Work is sold.

142. A reader seeking instructions on modifying gaming features in *World of Warcraft* gains nothing from Anthropic's use that substitutes for the Work's specific technical content.

143. Nor did Anthropic's use displace any functioning or plausible licensing market, let alone one Mr. Gilbert was entitled to control under the Copyright Act. No functioning market existed for licensing the Work for model training.

144. These factors—among others to be developed in discovery—confirm that any use of Mr. Gilbert's Work for LLM development and training is fair and does not constitute copyright infringement. The acquisition of the Work was similarly a fair use under the Copyright Act as it was done for the sole purpose of transformative LLM training and development.

**C. Anthropic's use of the Work for its CCS filter is a fair use**

145. Anthropic's use of LibGen-sourced content to build and run the CCS filter is also a non-infringing fair use because the purpose of such a guardrail is to prevent model outputs that reproduce portions of the Work. Such use is the opposite of infringement, is designed to *prevent* any possible substitution of the Work, and is quintessentially fair use.

146. Anthropic built these types of filters to stop Claude from reproducing text like the Work, not to reproduce it. Anthropic's CCS uses LibGen text as a reference point, solely to recognize when Claude's own output has drifted too close to someone else's words. No user of Claude sees the Work through the filter. No output is generated from the Work through the filter. The filter's only function is to catch and block outputs before they can reproduce protected text—which is consistent with copyright law.

147. The reference database underlying CCS serves a purpose unrelated to the Work's original purpose. The Work teaches readers how to modify *World of Warcraft*; the database exists only to detect textual similarity, not to convey that content to anyone. A tool built to catch and block matching text is not a substitute for a book built to teach players how to alter a game. And because no user can view, retrieve, or otherwise access the Work through CCS, the database cannot compete with the Work or divert any sale that Mr. Gilbert might otherwise make.

148. For the reasons above, Anthropic seeks a declaratory judgment under at least 28 U.S.C. §§ 2201, 2202 that Anthropic does not infringe and has not infringed any right in the Work held by Mr. Gilbert, and that Anthropic is not liable to Mr. Gilbert for damages, injunctive relief, impoundment, or any other remedy.

## PRAYER FOR RELIEF

WHEREFORE, Anthropic requests that the Court enter judgment in its favor and grant the following relief:

A. Dismiss the First Amended Complaint with prejudice and order that Mr. Gilbert take nothing;

B. Declare that Anthropic does not infringe and has not infringed any right in the Work held by Mr. Gilbert, including because any reproduction or use of the Work was fair use under 17 U.S.C. § 107;

C. Award such other and further relief as the Court deems just and proper.

## JURY DEMAND

Anthropic demands a trial by jury on all issues so triable.

Dated: August 19, 2026

Respectfully submitted,

*/s/ Lauren Papenhausen*
Lauren Papenhausen (BBO# 655527)
**WHITE & CASE LLP**
75 State St.
Boston, MA 02109-1814
Telephone: (617) 979-9300
Facsimile: (617) 979-9301
lauren.papenhausen@whitecase.com

Yar R. Chaikovsky (*pro hac vice*)
Andy LeGolvan (*pro hac vice*)
Amir Jabbari (*pro hac vice*)
**WHITE & CASE LLP**
3000 El Camino Real
2 Palo Alto Square, Suite 900
Palo Alto, CA 94306-2109
Telephone: (650) 213-0300
Facsimile: (650) 213-8158
yar.chaikovsky@whitecase.com
andy.legolvan@whitecase.com
amir.jabbari@whitecase.com

*Attorneys for Defendant Anthropic PBC*

**CERTIFICATE OF SERVICE**

I, Lauren Papenhausen, hereby certify that on August 19, 2026, I caused a true and accurate copy of the foregoing to be served on counsel and parties of record by CM/ECF.

*/s/ Lauren Papenhausen*
Lauren Papenhausen